04-3450

ADM/AJB

RECEIVED
04 JUN 29 PM 4: 22
CLERK U.S. DIST COURT
MINNEAPOLIS

# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| DAVID SILVERSTEIN, Derivatively On Behalf of SYNOVIS LIFE TECHNOLOGIES, INC., | Case No. |
| Plaintiff, | VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, GROSS MISMANAGEMENT, WASTE OF CORPORATE ASSETS AND UNJUST ENRICHMENT |
| vs. | |
| KAREN GILLES LARSON, WILLIAM G. KOBI, RICHARD W. PERKINS, ANTON R. POTAMI, TIMOTHY M. SCANLAN, EDWARD E. STRICKLAND, FARIBORZ BOOR BOOR, DAVID A. BUCHE, CONNIE L. MAGNUSON AND B. NICHOLAS ORAY | |
| Defendants, | |
| - and - | |
| SYNOVIS LIFE TECHNOLOGIES, INC., a Minnesota corporation, | |
| Nominal Defendant. | DEMAND FOR JURY TRIAL |

SCANNED
JUL 3 0 2004
US DISTRICT COURT MPLS

Plaintiff, by his attorneys, submits this Verified Shareholder Derivative Complaint (the "Complaint") against the defendants named herein.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action brought by a shareholder of Synovis Life Technologies, Inc. ("Synovis" or the "Company"), on behalf of the Company against certain of its officers and directors seeking to remedy defendants' violations of Minnesota law, including breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment that occurred between October 2003 and the Present (the "Relevant Period") and that have caused substantial losses to Synovis and other damages, such as to its reputation and goodwill.

## JURISDICTION AND VENUE

2.     This Court has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. _1332(a)(2), because complete diversity exists between the plaintiff and each defendant, and the amount in controversy exceeds $75,000. This action is not a collusive one to confer jurisdiction on this Court it would not otherwise have.

3.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with Minnesota so as to render the exercise of jurisdiction by the Minnesota courts permissible under traditional notions of fair play and substantial justice.

4.     Venue is proper in this Court because one or more of the defendants either resides in or maintains executive offices in this District, a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to Synovis occurred in this District, and defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## SUMMARY OF THE ACTION

5.      Synovis is a diversified medical device company engaged in developing, manufacturing and marketing medical devices for the surgical and interventional treatment of disease. The surgical business develops, manufactures and markets implantable biomaterial products, devices for microsurgery and surgical tools, all designed to reduce risk and/or facilitate critical surgeries, leading to better patient outcomes and lower costs. The interventional business manufactures components and devices used primarily in cardiac rhythm management, neurostimulation, and interventional vascular, including micro-wire components such as helices, conducting coils, stylets, guidewires, injection molded and machined components and is aggressively engaged in expanding its markets and customer base.

6.      Synovis' main product is "Peri-Strips." Peri-Strips are a patented biomaterial device that provide integrity to the staple line and reduces the risk of leakage of air, blood, or other bodily fluids. Most sales are primarily from gastric bypass surgery, a treatment for morbid obesity affecting more than 15 million Americans. Synovis claims that they can demonstrate that Peri-Strips have significantly better characteristics in strength, leak pressure and durability when compared to competitive products.

7.      During the Relevant Period, the defendants, as senior executive officers and/or directors of Synovis were privy to confidential and proprietary information concerning Synovis, its operations, finances, financial condition and present and future business prospects. The defendants also had access to material adverse non-public information concerning Synovis, as discussed in detail below. Because of their positions with Synovis, the defendants had access to non-public information about its business, finances, products, markets and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and board of directors meetings and committees thereof and

3

via reports and other information provided to them in connection therewith. Because of their possession of such information, the defendants knew or recklessly disregarded the fact that adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

8.    The defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public. The defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, the defendants had the opportunity to commit the fraudulent acts alleged herein.

9.    The true facts which were known to the defendants but actually concealed were as follows:

(a)    The Company's surgical business was not on track for year-to-year growth but was actually declining;

(b)    The Company's Peri-Strips were actually losing market share to a competing device made by Gore-Medical;

(c)    Even defendants' explanations for "why" the Company's Peri-Strips sales fell short were grossly false and misleading. Defendants claimed that sales fell due to capacity constraints, *i.e.*, the number of surgeons qualified to perform procedures had declined B taking sales down as well. This claim is false for several reasons:

(i)    Peri-Strips are only used in 25% of gastric by-pass procedures and therefore growth would track with market acceptance; and

(ii)    Even if the number of gastric by-pass procedures did decline, the medical communities conversion to the "laproscopic" method (which uses S-12 Peri-Strips) from the "open" method (which used 103 Peri-Strips), would have stemmed this decline in the Company's Peri-Strips sales.

4

(d)     The Company's "interventional" side had little to zero growth prospects. In fact, prior to the Relevant Period, the Company had shipped several quarters worth of inventory of implantable cardioverter-defibrillators to the Company's largest customer. This customer was refusing to take delivery of anymore of the Company's products until and unless it could actually sell the already shipped product that was stuffed in the customers' warehouses and had been idle for months; and

(e)     As a result of (a) - (d) above, the Company's projections of fiscal 2004 EPS of $.56-$.60 and revenues of $75-$79 million were false and misleading.

## THE PARTIES

10.     Plaintiff David Silverstein is, a resident of the State of New York, is and was at times relevant hereto, an owner and holder of Synovis common stock.

11.     Nominal defendant Synovis is a corporation organized and existing under the laws of the state of Minnesota with its headquarters located at 2575 University Avenue W., St. Paul, Minnesota 55114. Synovis describes itself as a diversified medical device company engaged in developing, designing, manufacturing and bringing to market medical devices for the surgical and interventional treatment of disease.

12.     Defendant Karen Gilles Larson ("Larson") is, and at all times relevant hereto was, President, Chief Executive Officer ("CEO") and a director of Synovis. Because of Larson's positions, she knew the adverse non-public information about the business of Synovis, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors' (the "Board") meetings and committees thereof and via reports and other information provided to her in connection therewith. During the Relevant Period, Larson participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and Securities and Exchange Commission ("SEC")

filings.   For FY:03, Synovis paid defendant Larson $373,400, in salary, bonus and other compensation, and granted her 3,637 options to purchase Synovis stock.  Larson is a resident of Minnesota.

13.     Defendant Fariborz Boor Boor ("Boor") is, and at all times relevant hereto was, Executive Vice President of Synovis.  Because of Boor's position, he knew the adverse non-public information about the business of Synovis, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith.  During the Relevant Period, Boor participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  For FY:03, Synovis paid defendant Boor $210,720, in salary, bonus and other compensation, and granted him 2,243 options to purchase Synovis stock.  Boor is a resident of Minnesota.

14.     Defendant David A. Buche ("Buche") is, and at all times relevant hereto was, Vice President of Marketing and Sales of Synovis Surgical Innovations.  Because of Buche's position, he knew the adverse non-public information about the business of Synovis, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith.  During the Relevant Period, Buche participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  For FY:03, Synovis paid defendant Buche $187,400 in salary, bonus and other compensation, and granted him 1,843 options to purchase Synovis stock.  During the Relevant Period, Buche sold 11,832 shares of Synovis stock for proceeds of $276,224.36.  Buche is a resident of Minnesota.

15.     Defendant Connie L. Magnuson ("Magnuson") is, and at all times relevant hereto was, Vice President of Finance, Chief Financial Officer and Corporate Secretary of Synovis. Because of Magnuson's position, she knew the adverse non-public information about the business of Synovis, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to her in connection therewith. During the Relevant Period, Magnuson participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. For FY:03, Synovis paid defendant Magnuson $187,590 in salary, bonus and other compensation, and granted her 1,879 options to purchase Synovis stock. Magnuson is a resident of Minnesota.

16.     Defendant B. Nicholas Oray ("Oray") is, and at all times relevant hereto was, Vice President of Research and Development of Synovis. Because of Oray's position, he knew the adverse non-public information about the business of Synovis, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. During the Relevant Period, Oray participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. For FY:03, Synovis paid defendant Oray $182,000 in salary, bonus and other compensation, and granted him 1,819 options to purchase Synovis stock. Oray is a resident of Minnesota.

17.     Defendant William G. Kobi ("Kobi") is, and at all times relevant hereto was, a director of Synovis. Because of Kobi's position, he knew the adverse non-public information about the business of Synovis, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate

7

officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Kobi participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. During the Relevant Period, Kobi sold 14,000 shares of Synovis stock for proceeds of $318,080. Kobi is a resident of Minnesota.

18.     Defendant Richard W. Perkins ("Perkins") is, and at all times relevant hereto was, a director of Synovis. Because of Perkins' position, he knew the adverse non-public information about the business of Synovis, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Perkins participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Perkins is a resident of Minnesota.

19.     Defendant Anton R. Potami ("Potami") is, and at all times relevant hereto was, a director of Synovis. Because of Potami's position, he knew the adverse non-public information about the business of Synovis, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Potami participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Potami is a resident of Minnesota.

20.     Defendant Edward E. Strickland ("Strickland") is, and at all times relevant hereto was, a director of Synovis. Because of Strickland's position, he knew the adverse non-public information about the business of Synovis, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with

other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Strickland participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Strickland is a resident of Texas.

21.     Defendant Timothy M. Scanlan ("Scanlan") is, and at all times relevant hereto was, Chairman of the Board and a director of Synovis. Because of Scanlan's position, he knew the adverse non-public information about the business of Synovis, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Scanlan participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Scanlan is a resident of Minnesota.

22.     The defendants identified in &&12, 17-21 are referred to herein as the "Director Defendants." The defendants identified in &&12-16 are referred to herein as the "Officer Defendants." The defendants identified in &&14-17 are referred to herein as the "Insider Selling Defendants." Collectively, the Director Defendants, the Officer Defendants and the Insider Selling Defendants are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

23.     By reason of their positions as officers, directors and/or fiduciaries of Synovis and because of their ability to control the business and corporate affairs of Synovis, the Individual Defendants owed Synovis and its shareholders fiduciary obligations of trust, loyalty, good faith and due care, and were and are required to use their utmost ability to control and manage Synovis in a fair, just, honest and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Synovis and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

24.     Each director and officer of the Company owes to Synovis and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's revenue, margins, operations, performance, management, projections and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

25.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Synovis, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial and directorial positions with Synovis, each of the Individual Defendants had access to adverse non-public information about the financial condition, operations, and improper representations of Synovis.

26.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Synovis, and was at all times acting within the course and scope of such agency.

27.    To discharge their duties, the officers and directors of Synovis were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of Synovis were required to, among other things:

(a)    Refrain from acting upon material inside corporate information to benefit themselves;

(b)    Ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(c)    Conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(d)    Properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(e)    Remain informed as to how Synovis conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

(f)    Ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations.

28.    Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and the

11

exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Synovis, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company during the Relevant Period has been ratified by the remaining Individual Defendants who collectively comprised all of Synovis' Board during the Relevant Period.

29.    The Individual Defendants breached their duties of loyalty and good faith by allowing defendants to cause or by themselves causing the Company to misrepresent its financial results and prospects, as detailed herein *infra*, and by failing to prevent the Individual Defendants from taking such illegal actions. In addition, as a result of defendants' illegal actions and course of conduct during the Relevant Period, the Company is now the subject of several class action law suits that allege violations of federal securities laws. As a result, Synovis has expended and will continue to expend significant sums of money. Such expenditures include, but are not limited to:

(a)    Costs incurred to carry out internal investigations, including legal fees paid to outside counsel; and

(b)    Costs incurred in investigating and defending Synovis and certain officers in the class actions, plus potentially millions of dollars in settlements or to satisfy an adverse judgment.

30.    Moreover, these actions have irreparably damaged Synovis' corporate image and goodwill. For at least the foreseeable future, Synovis will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Synovis' ability to raise equity capital or debt on favorable terms in the future is now impaired.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

31.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breach of their respective duties.

32.     During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did: (i) conceal the fact that the Company was improperly misrepresenting its financial results, in order to allow defendants to artificially inflate the price of the Company's shares; (ii) maintain the Individual Defendants' executive and directorial positions at Synovis and the profits, power and prestige that the Individual Defendants enjoyed as a result of these positions; and (iii) deceive the investing public, including shareholders of Synovis, regarding the Individual Defendants' management of Synovis' operations, the Company's financial health and stability, and future business prospects, specifically related to the Company's financials that had been misrepresented by defendants throughout the Relevant Period.  In furtherance of this plan, conspiracy and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

33.     The Individual Defendants engaged in a conspiracy, common enterprise and/or common course of conduct commencing by at least October 2003 and continuing thereafter.  During this time the Individual Defendants caused the Company to conceal the true fact that Synovis was misrepresenting its financial results.  In addition, defendants also made other specific, false statements about Synovis' financial performance and future business prospects, as alleged herein.

34.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, abuse of control, gross mismanagement, waste of

corporate assets and unjust enrichment; to conceal adverse information concerning the Company's operations, financial condition and future business prospects; and to artificially inflate the price of Synovis common stock so they could: (i) dispose of $594,304.36 of their personally held stock; (ii) protect and enhance their executive and directorial positions and the substantial compensation and prestige they obtained as a result thereof; and (iii) use the artificially inflated Company stock to acquire companies in stock-for-stock transactions.

35.     The Individual Defendants accomplished their conspiracy, common enterprise and/or common course of conduct by causing the Company to purposefully, recklessly or negligently misrepresent its financial results. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary and substantial participant in the conspiracy, common enterprise and/or common course of conduct complained of herein.

36.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## BACKGROUND

37.     Synovis describes itself as a diversified medical device company engaged in developing, designing, manufacturing and bringing to market medical devices for the surgical and interventional treatment of disease.

## IMPROPER STATEMENTS

38.     On October 16, 2003, the Individual Defendants caused Synovis to issue a press release entitled, "Synovis Life Technologies Provides Guidance for Fiscal 2004; Company Forecasts Consolidated Revenue Range of $75 Million to $79 Million And EPS Range of 56 Cents to 60 Cents for Fiscal 2004." The press release stated in relevant part:

14

Synovis Life Technologies, Inc., a diversified medical device manufacturer, anticipates consolidated revenue in the range of $75 million to $79 million, with earnings per diluted share of $0.56 to $0.60 for the upcoming fiscal year ending October 31, 2004.

* * *

"Our fundamental strategies are producing results, and we are enthusiastic about our growth prospects in fiscal 2004 and beyond," said Karen Gilles Larson, president and chief executive officer of Synovis Life Technologies. "The investments we have made in research and development, acquisitions, manufacturing capacity and infrastructure are delivering substantial gains in our interventional and surgical businesses, while positioning both businesses for future growth."

39. The next day, October 17, 2003, the Individual Defendants caused Synovis to issue a press release entitled, "Synovis Life Technologies Seeks to Clarify Market Confusion Regarding EPS Guidance for Fiscal 2004." The press release stated in relevant part:

Company's High-End EPS Guidance Exceeds Share-Adjusted EPS of Analysts Actively Covering the Company.

Synovis Life Technologies, Inc., a diversified medical device manufacturer, in response to confusion in the marketplace is issuing this statement about the fiscal 2004 guidance the company released yesterday: The company stated that it anticipates earnings per diluted share of $0.56 to $0.60 for the upcoming fiscal year ending October 31, 2004. The release noted that the company's guidance is based on 11.4 million shares outstanding, which includes 1.5 million shares from a private placement completed in September. The estimates of analysts actively covering the company referenced in various news reports yesterday, when adjusted for the new share count, are a consensus of $0.57 per diluted share for fiscal 2004. Therefore, the company's guidance of earnings per diluted share of $0.56 to $0.60 exceeds the share-adjusted EPS consensus of analysts actively covering the company referenced in the media yesterday.

40. On December 3, 2003, the Individual Defendants caused Synovis to reiterate its financial guidance for fiscal 2004 in a press release entitled, "Synovis Life Technologies Revenue Grows 27 Percent and Net Income Gains 67 Percent in Fiscal Fourth Quarter; Fiscal 2003 EPS of 47 Cents on Revenue of $58 Million." The press release stated in relevant part:

15

Outlook for Fiscal 2004

In mid-October, Synovis Life Technologies announced revenue and earnings guidance for fiscal 2004. The company anticipates consolidated revenue of $75 million to $79 million, a 29 to 36 percent increase over fiscal 2003 consolidated revenue. The company is projecting earnings per diluted share of 56 cents to 60 cents for fiscal 2004, a 19 to 28 percent gain over the just-completed year. This projection includes the impact of the 16 percent increase in outstanding shares as a result of the private placement.

Larson concluded, "We just finished a great year, and we are fully engaged in the process of continuing our growth and producing new opportunities in fiscal 2004 and beyond. We are well positioned. Both our interventional and surgical businesses have unique in-demand products in strong and growing markets. We are advancing and adapting our technologies and capabilities for opportunities ahead, seeking acquisitions with a sound strategic fit, and investing in R&D and infrastructure to set the stage for future growth."

41.     On January 13, 2004, the Individual Defendants caused Synovis to issue a press release entitled, "Synovis Life Technologies Reaffirms Annual Guidance Despite Slow Start In Intervention Business and Its Effect on First-Quarter Results." The press release stated in relevant part:

Synovis Life Technologies, Inc., a diversified medical device company, anticipates consolidated revenue and net earnings for its first fiscal quarter ending January 31, 2004, will be well below analysts' estimates. The company does not provide quarterly guidance, in large part due to the inherent variability that occurs in the interventional business. Revenue is expected to be near first-quarter 2003 levels, with net earnings below first-quarter 2003 levels. In the first quarter of last year, the company reported $12.5 million in revenue and net earnings of $793,000, or $0.08 per fully diluted share. The way the first quarter of fiscal 2004 is developing, interventional business revenue is expected to be around $5.5 million, while surgical business revenue is expected to be a record $7.0 million or greater. In the first quarter of fiscal 2003, interventional business revenue was $6.4 million, and surgical business revenue was $6.1 million. The company plans to announce 2004 first-quarter earnings on February 18, 2004.

"We understand the disappointment this announcement may cause our shareholders; however, we encourage them to look at the annual time horizon as a measure of our success, as we do," said Karen Gilles Larson, president and chief executive officer of Synovis Life Technologies. "Many of us at the company, along with our directors, are significant shareholders. We believe this slow start to the year in the interventional business is a short-term situation, and while certainly not desirable in its perception, we are not discouraged by it. We know what our prospects are and remain very enthusiastic about them. Our current business opportunities, and those in our pipeline, provide the basis for our excitement. We are advancing these opportunities daily in both business segments. At this point in time, we have no basis to believe that we will not reach our annual guidance."

16

The company reaffirmed its guidance for the current fiscal year ending October 31, 2004, for revenue in the range of $75 million to $79 million, with earnings per diluted share of $0.56 to $0.60. This guidance reflects revenue growth ranging from 29 percent to 36 percent, and growth in earnings per share of 19 percent to 28 percent over fiscal 2003.

\* \* \*

Larson continued, "We are expecting record revenue in the first quarter in our surgical business, with our Peri-Strips(R) product leading the revenue growth. More and more Peri-Strips data are becoming available, adding to the long clinical history which confirms the benefits of this product and its excellent performance in gastric bypass surgery, lung volume reduction surgery, and other lung resection surgeries. We plan to submit two 510(k) applications for additional Peri-Strips indications in the first half of this fiscal year. One of these applications could have very significant potential. We expect that consolidated revenue and earnings will ramp up sharply in the second half of this fiscal year. Our expectations are based, among other things, on the estimated timelines for new indications of current products, the estimated progressive growth of lung volume reduction surgery as patient awareness increases and the timelines for completion of development work for new interventional business customers and the ensuing production revenue. The bottom line is: despite the slow start in the interventional business, Synovis is expecting a good year."

42.     On February 18, 2004, the Individual Defendants caused Synovis to issue a press release entitled, "Synovis Life Technologies Reports Fiscal First-Quarter Results; Company Files Four 510(k) Applications With FDA in Fiscal 2004, Including New Peri-Strips Cardiac Application." The press release stated the Company's financial and operational results for the first quarter ended January 31, 2004, and provided the following details with respect to its guidance for fiscal 2004. The press release stated in relevant part:

"Let me emphasize what I said in our pre-announcement: While we are certainly not pleased with our first-quarter performance, we have abundant reasons to be optimistic about fiscal 2004 and far beyond," said Karen Gilles Larson, Synovis Life Technologies president and chief executive officer. "We continue to advance our opportunities, bringing them closer to realization. Specifically, the company filed four 510(k) submissions to the FDA during the last seven weeks."

"The interventional side of our business has experienced decreased demand for cardiac rhythm management (CRM) components, particularly implantable cardioverter defibrillator (ICD) components," Larson noted. "This is a dramatic swing from the 80 percent increase in demand in the first half of fiscal 2003. In addition, the customer draw rate did not improve to the degree we had expected as January developed. Other companies in the CRM market felt the results of the ICD shortfall, based on press releases issued in the last few weeks. These releases indicated that, while there had been substantial growth in the ICD markets in 2003, the growth was less than had been expected. As a result, it appears customers

17

accumulated inventory, which directly affects demand for our production.  Our customers' efforts to move to just-in- time inventory management will also affect near-term demand for our CRM components.  We expect interventional business CRM-related revenues to regain momentum as customers reduce inventories to reorder levels. Additionally, we expect new revenue sources throughout the fiscal year as current projects come to fruition and hit the revenue stream."

* * *

Larson continued, "We have a strong R&D pipeline and robust growth rates in the medical markets in which we participate.  We expect to re-establish strong momentum going into the second half of fiscal 2004.  We remain focused on building the business to increase the long-term value for all of our stakeholders."

* * *

"Even though the first quarter results fell short of our expectations, we have not lost our determination or enthusiasm to continue our growth and business expansion for the balance of this fiscal year and beyond," noted Fariborz Boor Boor, executive vice president of Synovis Life Technologies. "We have added seven new customers to our existing customer base, our newly structured devices group is working on several potentially large projects and our precision engineering group is experiencing good growth.  We continue to expand our core competencies across all of our businesses and facilities.  In addition, our first proprietary device should be cleared to market shortly.  Simply stated, the future of our interventional group is very bright."

Fiscal 2004 Outlook

In October 2003, Synovis Life Technologies issued fiscal 2004 annual guidance anticipating consolidated revenue of $75 million to $79 million and earnings per fully diluted share of 56 cents to 60 cents.  The company reaffirmed its fiscal 2004 guidance in its pre-announcement press release of January 13, 2004. After just one quarter of the current fiscal year, the company has no compelling information to change its fiscal 2004 annual guidance. As stated previously, the company expects consolidated revenue and earnings will ramp up sharply in the second half of this fiscal year.  The company's expectations are based, among other things, on estimated timelines for new indications of current products, the estimated progressive growth of lung volume reduction surgery as patient awareness increases and the timelines for completing development for new interventional business customers and the ensuing production revenue. In fiscal 2003, the company reported consolidated revenue of $58.0 million and earnings per diluted share of 47 cents. The above earnings-per-share projection for fiscal 2004 includes the impact of the 16 percent increase in outstanding shares as a result of a September 2003 private placement which netted the company $36.5 million in proceeds.

18

## DEFENDANTS' SCHEME BEGINS TO UNRAVEL

43.     On May 19, 2004, before the market opened, the Individual Defendants caused

Synovis to issue a press release entitled, "Synovis Life Technologies Reports Fiscal Second-Quarter

Results; Comments on Outlook for Fiscal 2004," shocking the investing public when it drastically

cut its guidance for fiscal 2004.  The press release stated in relevant part:

> "At the halfway point of the year, we have fallen behind our own expectations
> and have clearly not met the expectations of the market," said Karen Gilles Larson,
> Synovis Life Technologies president and chief executive officer.  "While the
> interventional business showed significant sequential improvement during the second
> quarter, it is not yet back to fiscal 2003 levels.  In the surgical business, several
> factors affecting the gastric bypass market evolved during the second quarter,
> constraining recent Peri-Strips sales growth and near-term growth prospects for
> Peri-Strips use in gastric bypass surgery.  The magnitude of the revenue shortfall in
> the interventional business, combined with changes in the gastric bypass market,
> significantly reduce the likelihood of the strong year-over-year growth we expected in
> fiscal 2004.
>
> "In both businesses, we invested in staff and infrastructure to prepare for
> future growth, which has obviously been delayed.  We have reviewed all expense
> categories thoroughly and are making prudent adjustments to manage costs without
> limiting future growth prospects."  Although second-quarter expenses increased 7
> percent over the year-ago period, they are about 18 percent below what the company
> had planned.
>
> *  *  *
>
> Larson commented, "Coming off impressive growth over the last several
> years, in the first quarter of fiscal 2004, our interventional business, along with some
> of our industry counterparts, experienced a material slowdown in customer orders for
> components for cardiac rhythm management devices, including implantable
> cardioverter defibrillators (ICDs).  This was due to customer accumulation of excess
> inventory.  While revenue increased by 48 percent in the second quarter of this fiscal
> year compared to the first quarter, the order rate for these components has not yet
> fully recovered.  The effect of the revenue decrease was exacerbated by additional
> infrastructure we put in place to support growth.  We have already reduced expenses
> and, as mentioned earlier, we continue to review and cut expenses where we can
> without jeopardizing future growth.  Further, we are actively seeking to reduce our
> market concentration which, in turn, will reduce our customer concentration.  This
> should lessen the inherent variability in the current business composition.  We are
> successfully bringing device opportunities into the development revenue stream,
> some of which could translate into significant manufacturing revenue and market
> diversification."
> *  *  *
>
> Fiscal 2004 Guidance

Synovis Life Technologies today adjusted its revenue and earnings guidance for the fiscal year ending October 31, 2004, to reflect the current market conditions for the company's surgical and interventional businesses as discussed above. The company now expects consolidated revenue of $60 million to $64 million, with earnings of $0.28 to $0.34 per diluted share. Previous company guidance for the current year was revenue of $75 million to $79 million, and earnings of $0.56 to $0.60 per diluted share.

44.     Investor reaction was swift and negative, with Synovis stock falling from a close of

$14.65 on May 18, 2004 to a close of $9.25 on May 19, 2004, for a single-day decline of more than

36% on very heavy trading volume.

45.     Several commentaries following Synovis' dramatic reduction of its guidance for fiscal

2004 provided additional details. A *Dow Jones* newswire article dated May 19, 2004, and entitled,

"Synovis Shares Fall as Firm Reduces Yearly Outlook," stated in relevant part:

Synovis blamed the reduced guidance on weakness in both its interventional business -- which makes components such as implantable cardioverter- defibrillators, or ICDs, to be used by other major medical device companies -- and its surgical business, which makes products used for cardiovascular surgeries.

* * *

A large chunk of revenue in the interventional business is derived from a single customer -- which the company hasn't disclosed. It warned Synovis last quarter that they overestimated demand for ICDs and, as a result, had built up excess inventory, said David Sterman, an analyst with Halpern Capital.

Synovis believed it would shortly resume normal business with that customer and expected business to rebound at some point during the second quarter, which didn't transpire, Mr. Sterman said.

The more disappointing part of the business, Mr. Sterman said, was the surgical business, which suffered when a competing medical device maker, privately held Gore Medical, developed a product to compete with Synovis's Peri- Strips, used to reduce risk of leakage and other complications related to surgical procedures. Peri-Strips are most commonly used in gastric bypass surgery.

Synovis had previously said the competing product wouldn't pose a great threat to Peri-Strips' growth, and expected Peri-Strips to be very strong in the second quarter, Mr. Sterman said. While Peri-Strips was the leading product in the surgical business in the second quarter, contributing $2.8 million in revenue, its growth was almost flat with the year-ago quarter.

46.    An article appearing in *SmartMoney.com* dated May 19, 2004, and entitled "Surgical Complication," stated in relevant part:

Investors just don't have the stomach for Synovis Life Technologies' (SYNO) stock any longer.

Shares of the medical-device maker plunged 37% to $9.25 Wednesday after Synovis reported disappointing quarterly earnings and warned of weaker-than-expected results for the full year. The St. Paul, Minn., company pinned part of the blame on slumping demand for its surgical product that's used in gastric bypass and other procedures.

"Everybody was caught by surprise," says David Sterman, an analyst at Halpern Capital, a Miami brokerage. "The company's last comments three months ago were that everything is going great. Their comments at the time, we thought, suggested business was getting strong in the midterm. But in the subsequent months, management learned that wasn't so." According to Sterman, Synovis preannounced poor results for the first quarter, making Wednesday's second-quarter earnings miss especially surprising.

\* \* \*

"This will be a dead year as far as the company is concerned," says Sterman of Halpern Capital. "This has quickly turned into a rebuilding year. It's hard to pinpoint what's going on. Management has changed its tune a couple of times, and right now it doesn't have much credibility. They've done a poor job of communicating how business is going. Synovis had a great track record the past couple of years, and 2005 may see it become a good growth company again, but 2004 looks like a lost year."

47.    A Quarterly Update Report dated May 19, 2004 and issued by Halpern Capital and its analyst David Sterman provided the following additional details:

On the company's conference call, a number of investors questioned why management failed to pre-announce the weak quarter, and why they waited this long to sharply take down full-year guidance. The response was quite weak. CEO Karen Gillis noted that as of three months ago on the last conference call, it still appeared as if business would rebound strongly. Clearly, the company has now known for a month or two that business remains weak. And to our view, they had a responsibility to communicate that with shareholders on a timely basis. Although the conference call was civil, there were clearly a number of investors that appeared dissatisfied with management's non-response to this concern. On several occasions, we have heard from our clients that management appears to run Synovis as a "private company". That clearly needs to change.

## REASONS THE STATEMENTS WERE IMPROPER

48.    The true facts which were known to the defendants but actually concealed were as follows:

(a)    The Company's surgical business was not on track for year-to-year growth but was actually declining.

(b)    The Company's Peri-Strips were actually losing market share to a competing device made by Gore-Medical.

(c)    Even defendants' explanations for "why" the Company's Peri-Strips sales fell short were grossly false and misleading.   Defendants claimed that sales fell due to capacity constraints, *i.e.,* the number of surgeons qualified to perform procedures had declined - taking sales down as well.  This claim is false for several reasons:

(i)    Peri-Strips are only used in 25% of gastric by-pass procedures and therefore growth would track with market acceptance; and

(ii)    Even if the number of gastric by-pass procedures did decline, the medical communities conversion to the "laproscopic" method (which uses S-12 Peri-Strips) from the "open" method (which used 103 Peri-Strips), would have stemmed this decline in the Company's Peri-Strips sales.

(d)    The Company's "interventional" side had little to zero growth prospects.  In fact, prior to the Relevant Period the Company had shipped several quarters worth of inventory of implantable cardioverter-defibrillators to the Company's largest customer.  This customer was refusing to take delivery of anymore of the Company's products until and unless it could actually sell the already shipped product that was stuffed in the customers' warehouses and had been idle for months.

(e)    As a result of (a) - (d) above, the Company's projections of fiscal 2004 EPS of $.56-$.60 and revenue of $75-$79 million were false and misleading.

## ILLEGAL INSIDER SELLING

49.     While in possession of the undisclosed material adverse information, the Insider

Selling Defendants sold the following shares of Synovis stock:

| Name | Position | Date | Shares | Price | Proceeds |
|------|----------|------|--------|-------|----------|
| David A. Buche | VP | 12/9/2003 | 496 | $ 23.30 | $ 11,556.80 |
| | | 12/9/2003 | 2,600 | $ 23.12 | $ 60,112.00 |
| | | 12/9/2003 | 3,504 | $ 23.11 | $ 80,977.44 |
| | | 12/9/2003 | 2,000 | $ 23.68 | $ 47,360.00 |
| | | 12/9/2003 | 632 | $ 23.66 | $ 14,953.12 |
| | | 12/9/2003 | 2,000 | $ 23.51 | $ 47,020.00 |
| | | 12/9/2003 | 100 | $ 23.85 | $ 2,385.00 |
| | | 12/9/2003 | 100 | $ 23.80 | $ 2,380.00 |
| | | 12/9/2003 | 400 | $ 23.70 | $ 9,480.00 |
| | | | **11,832** | | **$ 276,224.36** |
| William G. Kobi | D | 12/9/2003 | 14,000 | $ 22.72 | $ 318,080.00 |
| | | **TOTAL** | **25,832** | | **$ 594,304.36** |

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

50.     Plaintiff brings this action derivatively in the right and for the benefit of Synovis to

redress injuries suffered, and to be suffered, by Synovis as a direct result of the breaches of fiduciary

duty, abuse of control, gross mismanagement, waste of corporate assets, and unjust enrichment, as

well as the aiding and abetting thereof, by the Individual Defendants.  Synovis is named as a nominal

defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this

Court that it would not otherwise have.

51.     Plaintiff will adequately and fairly represent the interests of Synovis in enforcing and

prosecuting its rights.

52. Plaintiff is and was an owner of the stock of Synovis during times relevant to the Individual Defendants' wrongful course of conduct alleged herein, and remains a shareholder of the Company.

53. The current Board of Synovis consists of the following six individuals: defendants Scanlan, Larson, Kobi, Perkins, Potami and Strickland. Plaintiff has not made any demand on the present Board of Synovis to institute this action because such a demand would be a futile, wasteful and useless act, particularly for the following reasons:

(a) As a result of their access to and review of internal corporate documents; conversations and connections with other corporate officers, employees and directors; and attendance at management and Board meetings, each of the defendants knew the adverse non-public information regarding the improper accounting. While in possession of this material adverse non-public information regarding the Company, the following current member of the Synovis Board participated in the illegal insider selling:

(i) During the Relevant Period, Kobi sold 14,000 shares of Synovis stock for proceeds of $318,080. Because this defendant received a personal financial benefit from the challenged insider trading transaction, this defendant is interested and any demand upon him is futile;

(b) The Compensation Committee of the Board determines the compensation for the officers of the Company, provides for management continuity and administers the Company's stock-based compensation plans. The Compensation Committee is comprised of defendants Perkins, Kobi and Potami. As the members of the Compensation Committee singularly control the other defendants' awards, the remaining members of the Board will not institute this action against

24

defendants Perkins, Kobi and Potami. To do so would jeopardize each defendant's personal financial compensation. Thus, demand on defendants Scanlan, Larson and Strickland is futile;

(c)     The principal professional occupation of defendant Larson is her employment with Synovis, pursuant to which she received and continues to receive substantial monetary compensations and other benefits. Specifically, for FY:03, Synovis paid defendant Larson $373,000 in salary, bonus and other compensation, and granted her 3,637 options to purchase Synovis stock. Accordingly, defendant Larson lacks independence from defendants Perkins, Kobi and Potami, defendants who are not disinterested and/or independent and who exert influence over defendant Larson's compensation by virtue of their position as members of the Compensation Committee. This lack of independence renders defendant Larson incapable of impartially considering a demand to commence and vigorously prosecute this action;

(d)     According to Synovis' Proxy Statement filed with the SEC on or about January 23, 2004, defendants Strickland, Kobi and Potami were, during the Relevant Period, members of the Audit Committee. The Audit Committee is responsible for the selection of the Company's auditors and the review of the services performed by such auditors, including reviewing the annual financial statements, the scope of the annual audits, the fees to be paid to the auditors and the adequacy of the Company's internal controls for compliance with corporate policies and directives. The Audit Committee receives the auditors' report and may recommend changes in the accounting systems of the Company, if so warranted. By such actions, defendants Strickland, Kobi and Potami breached their duties by causing or allowing the improper financials described above. As a result of these defendants' breach of their duties, any demand upon them is futile;

(e)     The entire Synovis Board and senior management participated in the wrongs complained of herein. Synovis' directors are not disinterested or independent due to the following: defendants Scanlan, Larson, Kobi, Perkins, Potami and Strickland served on the Synovis Board during the Relevant Period. Pursuant to their specific duties as Board members, each was charged with the management of the Company and to conduct its business affairs. Each of the above-referenced defendants breached the fiduciary duties that they owed to Synovis and its shareholders in that they failed to prevent and correct the improper financials. Thus, the Synovis Board cannot exercise independent objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action because its members are interested personally in the outcome as it is their actions that have subjected Synovis to millions of dollars in liability for possible violations of applicable securities laws;

(f)     The Director Defendants of Synovis, as more fully detailed herein, participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from Synovis' stockholders or recklessly and/or negligently disregarded the wrongs complained of herein, and are therefore not disinterested parties;

(g)     In order to bring this suit, all of the directors of Synovis would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand;

(h)     The acts complained of constitute violations of the fiduciary duties owed by Synovis' officers and directors and these acts are incapable of ratification;

26

(i)     Each of the Director Defendants of Synovis authorized and/or permitted the false statements disseminated directly to the public or made directly to securities analysts and which were made available and distributed to shareholders, authorized and/or permitted the issuance of various of the false and misleading statements and are principal beneficiaries of the wrongdoing alleged herein, and thus could not fairly and fully prosecute such a suit even if such suit was instituted by them;

(j)     Any suit by the current directors of Synovis to remedy these wrongs would likely expose the Individual Defendants and Synovis to further violations of the securities laws that would result in civil actions being filed against one or more of the Individual Defendants, thus, they are hopelessly conflicted in making any supposedly independent determination whether to sue themselves;

(k)     Synovis has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants and current Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Synovis any part of the damages Synovis suffered and will suffer thereby;

(l)     If the current directors were to bring this derivative action against themselves, they would thereby expose their own misconduct, which underlies allegations against them contained in class action complaints for violations of securities law, which admissions would impair their defense of the class actions and greatly increase the probability of their personal liability in the class actions, in an amount likely to be in excess of any insurance coverage available to the Individual Defendants. In essence, they would be forced to take positions contrary to the defenses they will likely assert in the securities class actions. This they will not do. Thus, demand is futile; and

27

(m)     If Synovis' current and past officers and directors are protected against personal liability for their acts of mismanagement, abuse of control and breach of fiduciary duty alleged in this Complaint by directors' and officers' liability insurance, they caused the Company to purchase that insurance for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of Synovis.  However, due to certain changes in the language of directors' and officers' liability insurance policies in the past few years, the directors' and officers' liability insurance policies covering the defendants in this case contain provisions that eliminate coverage for any action brought directly by Synovis against these defendants, known as, *inter alia*, the "insured versus insured exclusion."  As a result, if these directors were to sue themselves or certain of the officers of Synovis, there would be no directors' and officers' insurance protection and thus, this is a further reason why they will not bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery.  If there is no directors' and officers' liability insurance at all then the current directors will not cause Synovis to sue them, since they will face a large uninsured liability.

54.     Moreover, despite the Individual Defendants having knowledge of the claims and causes of action raised by plaintiff, the current Board of Directors has failed and refused to seek to recover for Synovis for any of the wrongdoing alleged by plaintiff herein.

## COUNT ONE

### Against the Insider Selling Defendant for Breach of Fiduciary Duties for Insider Selling and Misappropriation of Information

55.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

56.     At the time of the stock sales set forth herein, the Insider Selling Defendant knew the information described above, and sold Synovis common stock on the basis of such information.

57.     The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects.  It was a proprietary asset belonging to the Company, which the Insider Selling Defendant used for their own benefit when they sold Synovis common stock.

58.     At the time of his stock sales, the Insider Selling Defendant knew that the Company's revenues were materially overstated.  The Insider Selling Defendant's sales of Synovis common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

59.     Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendant's fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendant obtained thereby.

## COUNT TWO

### Against All Defendants for Breach of Fiduciary Duty

60.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

61.     The Individual Defendants owed and owe Synovis fiduciary obligations.  By reason of their fiduciary relationships, the Officer Defendants and Director Defendants owed and owe Synovis the highest obligation of good faith, fair dealing, loyalty and due care.

62.     The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

29

63.     Each of the Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the financial results of the Company and failed to correct the Company's publicly reported financial results and guidance. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

64.     As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Synovis has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

65.     Plaintiff on behalf of Synovis has no adequate remedy at law.

## COUNT THREE

### Against All Defendants for Abuse of Control

66.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

67.     The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Synovis, for which they are legally responsible.

68.     As a direct and proximate result of the Individual Defendants' abuse of control, Synovis has sustained significant damages.

69.     As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

70.     Plaintiff on behalf of Synovis has no adequate remedy at law.

## COUNT FOUR

### Against All Defendants for Gross Mismanagement

71.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

72.     By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Synovis in a manner consistent with the operations of a publicly held corporation.

73.     As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Synovis has sustained significant damages in excess of hundreds of millions of dollars.

74.     As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

75.     Plaintiff on behalf of Synovis has no adequate remedy at law.

## COUNT FIVE

### Against All Defendants for Waste of Corporate Assets

76.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

77.     As a result of the improper accounting, and by failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper supervision, defendants have caused Synovis to waste valuable corporate assets by paying incentive based

31

bonuses to certain of its executive officers and incur potentially millions/billions of dollars of legal

liability and/or legal costs to defend defendants' unlawful actions.

78.     As a result of the waste of corporate assets, the Individual Defendants are liable to the

Company.

79.     Plaintiff on behalf of Synovis has no adequate remedy at law.

### COUNT SIX

### Against All Defendants for Unjust Enrichment

80.     Plaintiff incorporates by reference and realleges each and every allegation set forth

above, as though fully set forth herein.

81.     By their wrongful acts and omissions, defendants were unjustly enriched at the

expense of and to the detriment of Synovis.

82.     Plaintiff, as a shareholder and representative of Synovis, seeks restitution from these

defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and

other compensation obtained by these defendants, and each of them, from their wrongful conduct and

fiduciary breaches.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment as follows:

A.     Against all of the Individual Defendants and in favor of the Company for the amount

of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary

duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment;

B.     Extraordinary equitable and/or injunctive relief as permitted by law, equity and state

statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust

32

on or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to

assure that plaintiff on behalf of Synovis has an effective remedy;

     C.     Awarding to Synovis restitution from the defendants, and each of them, and ordering

disgorgement of all profits, benefits and other compensation obtained by the defendants;

     D.     Awarding to plaintiff the costs and disbursements of the action, including reasonable

attorneys' fees, accountants' and experts' fees, costs, and expenses; and

     E.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: July 29, 2004

                         THE SPENCE LAW FIRM
                         RUSSELL M. SPENCE, JR.


                         RUSSELL M. SPENCE, JR. (#241052)
                         10 South Fifth Street, Suite 700
                         Minneapolis, MN  55402
                         Telephone: 612/375-1555
                         Facsimile: 612/375-1511

                         FARUQI & FARUQI, LLP
                         NADEEM FARUQI
                         320 East 39th Street
                         New York, NY 10016
                         Telephone:  212/983-9330
                         Facsimile: 212/983-9331

                         Attorneys for Plaintiff

G:\Synovis\Complaints\Silverstein Der Cpt.doc

**VERIFICATION**

I, David Silverstein, am a plaintiff in the within action and a resident of the State of New York. I have read the foregoing complaint and know the contents thereof, except as to the matters therein stated to be alleged on information and belief, and as to those matters I believe them to be true.

July 23, 2004

_____
David Silverstein